May it please the Court. My name is John Seidlitz. I am from Great Falls, Montana. It is my pleasure to represent before this Court Ryan J. Price, a claimant for Social Security Disability Purposes. I would reserve two minutes if possible. Ryan Price applied for disability benefits in 2013. There was a hearing before the Administrative Law Judge in 2015 and a decision in 2015. Ryan is an individual who suffers from mental limitations. He has schizophrenia. It is uncontested. All the doctors have described it. There is a new word. I can't keep up with the DSMs. I can't even keep up with what number the latest one is. But it is schizoaffective disorder. I was going to say it is not full-fledged schizophrenia. It is schizoaffective disorder. Right. So I have looked that up to try to find out what that means. That means you have the symptoms of schizophrenia such as hallucinations and delusions as well as the issues dealing with mania and depression. The ALJ finds that he has schizoaffective disorder. So I don't know if that means he has delusions and hallucinations according to her findings because she will then go through later and say I don't believe that he is hearing voices. Now schizophrenia I think is a listed disorder. Correct. So if he had schizophrenia you win. But apparently he does not have a listed disorder. Well I think he meets the listing. Some of the doctors have said schizophrenia. Some have said schizoaffective disorder. They are not uniform in that. But in terms of the gentleman has hallucinations. He has got audio voices. I think that is uncontested except as to the some of the doctors say they are not observing in him what appear to be responses to internal stimuli which is another way of saying I am not sure he hears voices. Well and if that were a medical decision that that is required for schizoaffective disorder I wouldn't be here because it is a waste of my client's money to come out here. But what happens is there is one reference where a doctor says he does not appear to be responding to internal stimuli which is the guy talking to you. What do you think the error made by the ALJ was? The error is two parts. One in saying I don't think he has auditory hallucinations. He just doesn't have those. And because he doesn't have those then all of the limits that the were not incorporated to the vocational consultant. There was a medical expert. This ALJ admits she doesn't use medical experts. Dr. Monty Kuka. And Dr. Kuka finds that he in fact has hallucinations. He has these audio. He makes that statement that he believes he has them. And then he limits Ryan in terms of work. The judge said what are his limits? And Kuka says he can't work with the public. That is one. Second, he has got to be in a relatively isolated environment. And third, don't give him a lot of distractions or activity. Now that is the limit that the medical expert at the hearing gives because of these that what he admits are hallucinations that are occurring. The judge, and it may be a function of just not using medical experts at the hearing, when she gives the hypothetical to the vocational consultant in terms of okay, here is this gentleman's limits. Tell me what jobs are available. She says keep him out of the public in a low stress environment. Stop. Now, out of the public in a low stress environment is not the same as isolated. You've got to be isolated from coworkers, not just the public. He needs to be isolated. Second, in terms of distractions and activities, in terms of being low stress, and I pointed out in the brief and I'm upset with some of the work that they did for the papers to get to the there is a little corner over there where people make copies. I mean, the staple employees make copies. And you bring your stack in and you hand it to them and they go make copies. In five minutes, you can make those copies. You can be the employee of the month after five minutes of training. It's low stress. Here is a stack of papers. How many copies do I make? It's not isolated. It doesn't avoid distractions. The problems that Ryan Price is going to have in that, what the judge has described as the job low stress, is the fact that even though he doesn't talk to the public, they're walking by. They come in. There's an announcement overhead. We need a price check. There's people checking out at the counter next to him, coming into the store, leaving the store. So low stress does not equate with what the medical expert. You know, now it seems like you're kind of nitpicking in the substantial evidence because if you look at it in the totality, there's a layperson's way of kind of rephrasing what the Kuklis said. And you're saying, well, low stress, you're interpreting that to mean that he needs to be isolated or that that doesn't include isolation. That is absolutely what I'm saying. In terms of, and most of the time when you have a medical expert and the judge says, what are their problems, and the medical expert will give those, those limits are dictated. I'm not a vocational consultant. I don't understand any of it. All I've got to do is say, this medical person said here are the limits. I turn to the vocational person and say, under these limits, what can this person do? Those are left out here. You ask, the start of the vocational discussion here came from the question about, well, what was the error? What has the judge done wrong in terms of the delusions, the auditory hallucinations? Well, what's happening is when you decide, when the judge decides he doesn't have those, when you decide he doesn't have those, then you don't need to keep him away from distractions and activities. Because people suffering from schizoaffective disorder don't need a lot of activity and they don't need to be bombarded and get these activities going in their head and the voices. And the second thing is, when they are dealing with that, when somebody's yelling in my head while I'm talking to you here, that's distracting. And so somebody with this disorder has a very difficult time concentrating on a question and forming an answer and getting it back. Because there's this person in there telling me something, whatever it is, or maybe it's just a noise, but it's very distracting. And so when the judge said, I'm not going to believe that there were hallucinations, these auditory hallucinations, which are based upon, well, there's no internal stimuli. There's nobody that tells us I should respond and be talking to this person who's talking to me. And if I don't do that, I'm not hearing these voices. And that's essentially what she did. Dr. Kuka at the hearing did not say you needed to respond to internal stimuli. The judge didn't ask him. Isn't that a weakness in his case here? You want to say the remaining thing? I would appreciate that. Thank you. Good morning, Your Honors. Michael Howard for the Commissioner. Your Honors, Price claims to hear voices that he cannot ignore. And he says that he was fired from working at Home Depot because the voices told him to watch YouTube instead of working. The LJ did not need to believe these extreme claims, but then could instead discuss the varying comments from treating, examining, and non-examining doctors who all questioned the degree of his schizoaffective disorder. There are two main issues in this case, the plaintiff's testimony and the testifying medical expert, Dr. Kuka, which Price's attorney has already talked about today. I wanted to talk about the comments at the hearing today from Price. I think there is this claim that the LJ said that there were no hallucinations, and that's simply not what the LJ found. It's not the LJ's duty to spell out exactly how many hallucinations the person would have over time. The LJ is instead concerned with what the person can do at work. And for that question, the LJ naturally called a testifying medical expert, a psychologist, and it's very clear from the decision, I believe it's at page 28 of the Dr. Kuka explained essentially that Price would hear some voices, that they were kind of a chitter-chatter that did not tell him or command him to do things. And this really goes to the heart of this case, which is that that opinion and many of the other records from treating, examining sources undermine what Price told the LJ, which is that he heard essentially commands that would tell him to do things that he could not ignore. So the LJ gave Dr. Kuka's opinion great weight, and then the LJ translated those opinions into the residual functional capacity. You know, if I put aside all of the sort of the technical talk, which we have to do, I realize that, and I look at this man's record, and I put myself in the position of an employer with a job that will have, you know, pretty much off to one side and so on. He's a terrible employee, and I'm going to fire him within about a month. Your Honor, I do acknowledge that there's mixed evidence in this case, and this is someone who maybe is closer to the standard for disability, but the standard is very strict under the Social Security Act. And we're looking at, you know, can a person with these various limitations do any work available in the national economy? And as long as those numbers are significant, that's the statutory and regulatory scheme that we're operating under. And he didn't — and we have the medical expert saying he did not meet or equal the listing at step three. So — Your Honor, that does not appear to be an issue in this case. It is argued by the appellant, but I would agree, Your Honor, that he would not meet that. I would imagine it's not an issue for me, Your Honor. So just to return briefly again to the issue of Dr. Kuka, Price is arguing that the ALJ somehow overlooked what the doctor said at the hearing and did not account for those findings. But the district court explained this issue pretty clearly at page 11 of the And the ALJ adopted those specific phrases into the RFC. And then the — Dr. Kuka also used a broader term, saying a relatively isolated work environment. And then it was for the ALJ, we would argue, to translate that comment. What does that mean in terms of specific limitations on what someone can do? Because, again, the ALJ is charged with formulating this finding about the ability to work that's about specifically what can this person do in the workplace. So the ALJ translated that general phrase about relatively isolated environment and said — and translated it into, again, no public contact, no tandem work, and then some other limitations on social functioning. And was there anything in Dr. Kuka's testimony that would suggest the limitation goes beyond those sublimitations? No, Your Honor. Not in my reading of it. And, again, in the briefing, Price has argued that Dr. Kuka somehow established that he met a listing or something of that nature. But when we actually read the testimony at page 635, I believe it was, of the record, the doctor is quite clear he does not meet a listing at step three. We also have a partial credibility finding with respect to Price. Is that how you would say treated his testimony as to his limitations and what was happening? Yes. Yes, Your Honor. Essentially, there were several observations from treating and examining sources saying that Price exaggerated or did not seem to have the symptoms he had. But the ALJ discussed those records, rightfully so, but at no point said that this person was completely feigning any illness or something along those lines. No, the ALJ actually, I thought, was quite gentle, but did express some skepticism about the credibility, but then saying, I'm not sure he intended to mislead, but he appears to have been exaggerating. Exactly. Exactly right, Your Honor. So this case is really about... The psychologist or whomever said he seems to exaggerate the symptoms that people think he were looking for. That's the way he put it. I believe that was Dr. Nash, but yes, Your Honor, that's correct. So this case is really about the extent of the symptoms and exactly what do they do for his ability to work. And yes, the evidence does vary somewhat over time, but the ALJ did call that medical expert to help make that decision. So counsel, if I could ask a question. Do we have any Ninth Circuit specific precedent or Supreme Court precedent that says how closely the ALJ's language to a V.E. vocational expert needs to track exactly what the limitations given by a doctor are? That's a good question, Your Honor, and unfortunately, our briefs do not set out all the relevant, and I fault myself for that, we have not set out all the pertinent authorities that might fall on that. We did cite the Tomasetti case, not for that proposition, and Tomasetti held that the ALJ is the final arbiter of all the ambiguities in the medical evidence. And then we have other cases which were not directly discussed in the briefing of this case, such as Stubbs Danielson and I believe the recent Marsh case, which touched on this issue in a related way in the social security context, but not this precise issue, because these are kind of fact-specific. We don't have that precise issue. Okay. Thanks. Your Honors, unless the Court has further questions, I'd yield the remainder of my time. Thank you. Thank you. If I may pick up with your question about the vocational consultant, my initial brief under the section on the vocational expert specifically notes this Court's findings all the way back to 1984. It's not new law. In order for a vocational expert's testimony to have any value, the hypothetical must set forth all of a plaintiff's impairments, specifically including pain. The opinion of the expert cannot be relied upon if the hypothetical is not supported in the record and does not reflect the limitations. And so what we have here is not nitpicking. This is the difference, and it's the reason the specifics are given to the vocational consultant so that the lawyers and the judge as a lawyer don't have to make vocational decisions. We just give them the elements and say, you tell us. This is a practical question in your experience in these cases. Is the vocational expert typically in the room to hear some of the testimony that then is translated into the instruction to the vocational expert? In Montana, at least, where I practice in Great Falls, the judges are in billings. We do everything by video. And the vocational consultant is usually at a bozeman, and they're there by telephone, not by video. But they listen to the whole hearing. They have, and they will get on and testify. I've looked at the medical records. You've sent me the file. And they do that before the hearing and then turn around and listen to all the testimony. Well, they've heard the testimonies, and then they hear, as it were, the distillation of the testimony with the limitations as their instructors. Right. But they're not told to just listen to the testimony or assume the testimony. Right. I understand that. Okay. In terms of Dr. Kuka's testimony, I would finish with this. His testimony is set forth in my reply brief at page three. He says, quote, I think it's clear the claimant often has difficulties with his paranoid ideas and distractibility due to voices, particularly when he's not adequately treated. He goes on saying, he should not be working with the environment that does not have a lot of activities and distractions. So those were all limits that he gave. Thank the Court. Thank you. Thank you. The case just argued, Price v. Berryhill is submitted.
judges: McKeown, W. Fletcher, Gould